UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CINDY SPAIN,                                )
                                            )
    Plaintiff,                              )
                                            )
    v.                                      )    Case No. 09-1088
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security             )
Administration,                             )
                                            )
    Defendant.                              )

## O R D E R

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion to Affirm. For the reasons set forth below, Plaintiff's Motion for Summary Reversal [#13] is GRANTED, and the Commissioner's Motion to Affirm [#15] is DENIED.

### BACKGROUND

Plaintiff, Cindy Spain ("Spain"), was 48 years' old at the time of her administrative hearing. (R28) She is 5'7" and weighs approximately 171 pounds. (R38) She is not married and has two adult children. (R39) She lives on her own in a second story apartment; there are 12 stairs leading up to her apartment. (R40) Spain drove herself to the hearing, taking two breaks during the hour long drive. (R40-41) She has a high school diploma and can read and write in the English language. (R42)  Spain last worked as a

cashier/stocker for the Dollar Store in 2004-2005.  Id.  In the past, she was employed as a bartender, short-order cook, waitress, and deli worker.  (R62)

Spain underwent a partial mastectomy and lymph node dissection in September 2002 for breast cancer; in November 2006, her physician observed no evidence of metastatic disease in her chest.  (R20)  She was involved in a car accident in 2003 in which both of her ankles were broken.  (R17)

On May 31, 2005, Spain applied for supplemental security income ("SSI"), alleging disability that began on September 25, 2002.  Her application was denied both initially and on reconsideration.  (R72-76, R82-85) Spain requested a hearing before an administrative law judge ("ALJ").  (R86)  A hearing was held before ALJ David Thompson on November 29, 2007, at which Spain, who was represented by counsel, and vocational expert ("VE") James Reagans appeared and gave testimony.  (R34)

At the time of the hearing, Spain was taking Vicodin for back and leg pain, Zoloft for anxiety and depression, Fosamax to build bone strength, and Amidrex to help build her immune system.  (R44) However, she stated that she did not believe they were doing the job the doctors wanted them to do.  Id.  She elaborated that the medications do relieve the pain, and she doesn't want to go off the Zoloft; the other two medications she has to take because of her cancer that she had back in 2005.  (R45) The medications make her tired, and the Amidrex makes her joints sore, causes problems with using her hands, and leaves her feeling nauseous for about an hour after taking it. (R45, R59-60)

Spain testified that her back causes her pain to stand or even sit; she has to move around after about 20-30 minutes.  (R46, R50) She can walk no more than a half block to a block before needing to sit down.  (R50-51)  Standing also causes swelling and throbbing

in her foot, and she has to lie down and elevate it to get relief. (R46, R59-60) She cannot fully raise her right arm as a result of scar tissue, but can lift a gallon of milk and push/pull to open doors and drawers. (R47, R51-53) Spain stated that she cannot feel her right foot and really shouldn't be driving, despite the fact that she drove herself to the hearing. (R47-48) She cannot go for walks anymore because of her pain, should not climb stairs, does not kneel, and has trouble getting back up after bending. (R48) Although she has no hobbies that she is still able to enjoy, she is able to walk her dog. (R54) She is able to feed, bathe, and dress herself, as well as care for her personal hygiene. (R55) As a result of her depression, Spain commented that she is not very social and stays at home because going out makes her anxious. (R49) She does walk across the hall to visit her neighbor once or twice a week or occasionally visits her daughter. (R55-56)

Spain testified that on a typical day, she reads the newspaper in the morning, watches about six hours of television, prepares her own meals, and makes her own bed. (R56-57) She lays down for about four hours during the day and goes to bed most nights by 7:00pm because she is tired. (R58) Her daughters do the laundry and housekeeping for her, as well as help her go grocery shopping. (R57)

The ALJ posed a hypothetical question to the VE:

> Q: I'd like you to assume we have an individual the same age, education, and experience as the Claimant. The individual is able to lift ten pounds frequently, 20 pounds occasionally, able to stand for at least two hours in an eight-hour day, sit for six hours in an eight-hour day, unlimited pushing and pulling, capable of frequent postural activities except for occasional balancing and crouching, and no ropes, ladders, or scaffolds. How would these restrictions affect the performance of Claimant's past relevant work?
>
> A: The past relevant work, Your Honor, would be precluded.

Q  Would there be other jobs in the economy such an individual could perform?

A: Yes, sir.  There would be some jobs.  I think there would be, for example, there would be unskilled cashiering jobs. And I'm referring to Cashier II, 211.462 . . . 010.

Q: How many of those jobs are in the economy?

A: Well, no, I want to make a clarification.  That specific title is considered light work, but I think there would be, in my estimation, in Illinois, approximately 2,500 that would exist with the – basically need to sit – well, would need to sit for the majority of the workday, as you've described in the hypothetical.  I think there would be certain packaging jobs, Your Honor, unskilled packaging jobs such as 559.687-014.  Currently in Illinois, about 1,000 of those will exist.  One other example would be unskilled assembly work, such as 713.687-018.  And there are currently in Illinois, about 3,068 of persons doing that type of work.  I think the other example that I could give you, Your Honor, would be unskilled telemarketing or telephone solicitor.  That one is 299 . . . 357-014.  Again to clarify a distinction between the DOT and my testimony, that's considered low end semi-skilled, SVP-3.  However, in this region it is unskilled work and could be learned within 30 days.  Presently in Illinois, there are probably right at 16,000 – slightly above that, 16,019, to be exact.

* * *

Q: Okay.  Now these jobs that you've given me, is this a representative sampling or is this an exhaustive list?

A: Representative, Your Honor.

Q: Okay.  I'd like to change the hypothetical to a straight sedentary with a sit/stand option, still – let's put in occasional postural limitations, still no ropes, ladders, or scaffolds.  Okay.

A: Are you changing the lifting then to a straight sedentary?

Q: Lifting is to a straight sedentary, yes.

A: All right, sir.

> Q: How would these restrictions affect the jobs you just gave me?
>
> A: I don't think that those restrictions would change my testimony about those jobs, Your Honor.
>
> Q: Okay. Let's add to the hypothetical, that the individual, due to pain or whatever, is going to be less than 80-percent productive on the job. How is that going to affect employability?
>
> A: I think in general, Your Honor, that would create difficulty for a person to maintain employment.

(R64A-67)

Spain's attorney then asked the following questions:

> Q: Mr. Reagans, does [sic] any of the jobs permit a person to lie down on an at will basis?
>
> A: No, sir.
>
> Q: Is there any – you've mentioned in your testimony that the DOT representation on many of these jobs is light. Yet, your testimony is that many of them are performed at the sedentary level. Is there any specific publication of the numbers of jobs that those individual DOT numbers that you gave us have with regard to how many of those jobs are sedentary as opposed to how many of them are light?
>
> A: First of all, Mr. Henry, I just want to say, I don't think I said many or several. I think I listed two occupations where there was a difference in the DOT and my testimony. But, no, there isn't. I mean, the Department of Labor, this information comes from census data. These jobs are grouped. There's no data to a specific job, DOT job title and description.
>
> Q: Okay. I was just curious of where you got the information that lead [sic] you to the conclusion that these jobs could be performed at a sedentary level, from – if the DOT says they're light.
>
> A: From experience, observation, and my work in vocational rehabilitation.

> Q: Have you done a recent job study in this particular area?
>
> A: What particular area, sir?
>
> Q: These two jobs that you indicate that the DOT says they're light, yet you maintain can be performed at the sedentary level.
>
> A: No. My answer is, I have not recently done a labor market survey for those two occupations.

(R67-68)

On April 12, 2008, the ALJ issued his decision. (R11) The ALJ found that Spain has severe impairments of bilateral ankle fractures with associated soft tissue injury in her right leg based on the requirements in the Regulations, because her condition significantly limits her ability to perform basic work activities. (R16) She also has an impairment of chronic lumbar pain secondary to a lumbar compression fracture, but this impairment is nonsevere because the evidence does not show that it significantly limits her ability to perform basic work activities. Id. Finally, Spain has been diagnosed with dysthymic disorder, which is also nonsevere due to only mild restrictions on the activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace, and no episodes of decompensation. Id. The ALJ determined, however, that Spain does not have an impairment or combination of impairments listed in or medically equal to one listed in 20 CFR Part 404, Subpart P, Appendix 1. Id. He recognized impairments posed by Spain's ankle condition but found that this did not satisfy the listing because the medical evidence did not show gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints with involvement of one major peripheral weight-bearing

joint, resulting in inability to ambulate effectively. (R17) The ALJ also noted that Spain's soft tissue injury had been considered, but does not show the required continuing surgical management directed toward the salvage or restoration of major function. Id.

After considering the medical evidence in the record and relevant credibility factors as a whole, the ALJ found that Spain retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 416.967(a) except that she needs to perform work with a sit/stand option, cannot climb ladders, ropes, or scaffolds; occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching or crawling. Id. The ALJ concluded that Spain's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (R18) However, her assertions regarding the intensity, persistence, and limiting effects of the symptoms were found to be not credible to the extent that they are inconsistent with the RFC assessment. Id.

The ALJ considered the reports from Spain's daughter that Spain's injuries cause her to live in pain every day. Id. He also considered her behavior during the hearing, including the functional abilities and any symptoms of discomfort that she displayed. Id. The ALJ then reviewed medical records following her ankle surgery in 2003 and the post-operative treatment that she received. Id. He further discussed the results of a consultative examination in November 2005, as well as an RFC assessment from that same time period. (R18-19) The ALJ also observed that the medical records revealed a history of conservative treatment, numerous missed appointments, and Spain's failure to assist her healing by giving up smoking. (R19)

With respect to her back pain, the medical records demonstrated findings of intervertebral disc space narrowing, a compression fraction in 2004, and mild degenerative

disc disease and moderate disc space narrowing in 2005. Id. In considering Spain's claimed mental impairment, the ALJ reviewed a psychological consultative examination in November 2005 that found her able to perform all normal activities of daily living and concluded that her dysthymic disorder would not significantly impair her ability to perform work related activities. Id. Dr. Phyllis Brister completed a psychiatric review technique report during this time frame, opining that Spain experienced only mild restrictions on the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. Id.

An RFC prepared by Dr. Akeson in November 2007 found that she was capable of lifting 10 pounds occasionally, standing and/or walking with a sit/stand option less than two hours in an eight hour day with standing/walking to be kept to a minimum, pushing or pulling only with her lower extremities. (R20) She was never to climb ramps, stairs, ladders, ropes, or scaffolds or balance, kneel, crouch, crawl, or stoop. Id. Dr. Akeson further asserted that her continuous pain would cause Spain to miss more than three days per month and that she was totally disabled and unable to work. Id.

The ALJ noted that Spain's ankle fractures have adequately healed, and she attributes none of her symptoms to her leg wound. Id. He then opines, without citation to authority or medical evidence, that her difficulties with walking or standing are affected more by her back problems, which have been determined on objective examination to be mild and require only conservative treatment. Id. The ALJ further found no record of psychiatric treatment for her claimed severe depression. Id.

The ALJ observed that her claimed limitations were contradicted by her performance and conduct at the time of the hearing and that Spain admitted obtaining pain relief from

Vicodin. Id. He further considered the fact that Dr. Akeson's RFC did not mention her claimed need to lie down for any period of time during the day or explain why she would miss at least three days of work per month. Id.

Past relevant work was found to be precluded. (R21) Based on a consideration of her age, education, work experience, and residual functional capacity, the ALJ concluded that she retained the capacity to perform a range of sedentary work and that she was not under a disability as defined under the Social Security Act at any time since her alleged onset in September 2002. (R22)

Spain submitted a Request for Review of Hearing Decision. (R9-10) On January 16, 2009, the Appeals Council declined review of her claim, and the ALJ's decision became the final decision of the Commissioner. (R1-4) This appeal followed. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

In order to be entitled to SSI, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment

renders the plaintiff unable to engage in any substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are

supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

In her appeal, Spain raises essentially four claims: (1) the ALJ erred by failing to articulate why Spain did not meet the Listings and by substituting his opinion for that of the treating physicians; (2) the ALJ ignored an entire line of evidence that was contrary to his findings; (3) the vocational testimony was insufficient due to the failure of the ALJ to include all of Spain's limitations in the hypothetical; and (4) new and material evidence was submitted demonstrating that the Commissioner had not met his burden at Step 5. As the Court finds that the second issue to be dispositive, there is no need to address the remaining arguments at this time.

Spain argues that the ALJ ignored a whole line of contrary evidence and erroneously discounted the opinions of his treating physicians. The Seventh Circuit has recognized that a treating physician's opinion is not binding on the Commissioner. Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982). However, there is no presumption of bias against a treating physician's disability opinion. Edwards v. Sullivan, 985 F.2d 334, 337 (7th Cir. 1993). Rather, the ALJ, as the trier of fact, must consider the treating physician's possible bias. Id. The Commissioner will not give controlling weight to the treating physician's opinion on the nature and severity of the claimant's impairments unless the treating physician's opinion "is well-supported by medically acceptable clinical and laboratory

diagnostic techniques" and consistent with substantial evidence in the record. 20 C.F.R. § 416.927(d)(2); Moss v. Astrue, 555 F.3d 556, 560 (7th Cir. 2009).

> In short . . . it is up to the ALJ to decide which doctor to believe -- the treating physician who has experience and knowledge of the case, but may be biased, or that of the consulting physician, who may bring expertise and knowledge of similar cases -- subject only to the requirement that the ALJ's decision be supported by substantial evidence.

Micus v. Bowen, 979 F.2d 602, 609 (7th Cir. 1992).

It is the province of the ALJ to resolve evidentiary conflicts. Ehrhart v. Secretary of Health and Human Services, 969 F.2d 534, 542 (7th Cir. 1992); Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). The existence of an evidentiary dispute is not grounds for reversing the ALJ's decision to credit one version of facts over another. Herr v. Sullivan, 912 F.2d 178, 181 n.4 (7th Cir. 1990) However, the ALJ must explain with particularity the basis of his decision. Young v. Secretary of Health and Human Services, 957 F.2d 386, 393 (7th Cir. 1992).

Spain asserts that the findings of Dr. Akeson should have been given controlling weight, resulting in a finding of disability. In 2007, Dr. Akeson opined that he observed some swelling and stiffness in both ankles, although her right ankle joint appeared to be well-healed in recent x-rays and had no evidence of arthritis. (R852) He observed some arthritis in her foot, reduced sensation in the right foot, and reduced range of motion that he expected to be permanent, leading ultimately to difficulties with squatting, kneeling, etc.

Id. In completing a questionnaire on Spain's ability to do work-related activities, Dr. Akeson found that she could lift 10 pounds occasionally, could stand or walk for less than two hours in an eight-hour work day, needed the option to sit, stand, or lie down for pain control, had no limitation on sitting, was limited to pushing or pulling with her lower extremities, could never climb, balance, kneel, crouch, crawl, or stoop, and had no manipulative, visual/ communicative, or environmental limitations. (R853-55) He then concluded that Spain would likely miss more than three days of work per month as a result of her continuous pain, could not be gainfully employed, and was totally disabled and unable to work given that she reached maximum medical improvement some time ago. (R855) In response to the question of whether she was disabled as of September 2002, Dr. Akeson responded only that she had breast cancer at that time. (R856)

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight so long as it is supported by medical findings and consistent with substantial evidence in the record. Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008), *citing* Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004). The weight to be afforded to the treating physician's opinion depends on consideration of several factors: (1) the length, nature, and extent of the physician and claimant's treatment relationship; (2) whether the physician supported his or her opinions with sufficient explanations and medical findings; (3) and whether the physician specializes in the medical conditions at issue; and (4) the degree of consistency between the opinion and other evidence in the record. Id.; 20 CFR § 404.1527(d).    "If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ

'minimally articulate[d]' his reasons – a very deferential standard that we have, in fact, deemed lax." Id., *quoting* Berger v. Astrue, 5165 F.3d 539, 545 (7th Cir. 2008).

Here, the ALJ concluded that while there is no doubt that Spain experiences pain from her conditions, her ability to walk and stand is affected more by her mild back impairments, but provides no authority or citation to medical evidence in support of this conclusion. (R20) He criticizes Dr. Akeson's opinion for not addressing her need to lie down for any period of time or explaining why she will miss at least three days of work per month. Id. That being said, he found Dr. Akeson's RFC and his opinion on the need for a sit/stand option and her sitting, standing, and walking capacities were "in harmony." Id. The ALJ therefore gave controlling weight to Dr. Akeson's opinions concerning Spain's exertional and non-exertional capacities with the exception of lifting and/or carrying. (R21) All other aspects of his RFC were given little weight "due to lack of substance" without further elaboration. Id.

The ALJ found the opinions of the DDS consulting physicians in all other aspects of Spain's RFC to be entitled to substantial weight, as were the opinions of the DDS mental health professionals. Id. Findings of fact by state agency medical professionals regarding the nature and severity of an individual's impairments were granted probative weight. Id. However, the ALJ gave no rationale for these credibility determinations.

The ALJ based his conclusion that Spain has overstated the effect of her impairments and pain on the fact that Spain's ankle fractures have adequately healed, the leg wound has demonstrated no effect on her walking or standing, and her mild back impairments are more the cause of her difficulties. (R20) She was able to drive herself a total of two hours round-trip to the hearing, waited for the hearing to begin, sat for the

majority of the nearly one-hour hearing, standing only occasionally, and obtains pain relief from Vicodin. Id. The ALJ found that this demonstrated an ability to function "for multiple hours without needing to lie down as well as that her right foot (operating the gas and brake pedals) is more robust than represented." Id.

The record reveals other evidence in the record that could lend support to the ALJ's decision. Following her ankle surgery in 2003 and follow-up treatment through January 2004, Spain did not see Dr. Akeson for a year and a half, with his records showing a string of cancellations and missed appointments. (R545) She kept an appointment in June 2005, during which she complained of bilateral foot pain particularly on the right side and first thing in the morning. Id. Dr. Akeson observed that her ankles were doing fairly well despite some restriction in motion on the right side, attributed her pain in part to plantar fasciitis and a tight Achilles tendon, and recommended stretching exercises and the use of a night brace. Id. Spain did not see Dr. Akeson again until November 2007, more than two years later, when she was re-examined at the request of her attorney in connection with her disability proceedings. (R851) Accordingly, a substantial period of time passed without any interaction or treatment prior to Spain's solicitation of Dr. Akeson's disability opinion.

The Commissioner also cites the opinions of other physicians of record in support of discounting Dr. Akeson's opinions. Although the ALJ notes the opinion of Dr. Donald Habecker, a consulting physician who examined Spain in November 2005, he does not discuss the weight he assigned to such opinion or cite Dr. Habecker's observation of a normal gait and lack of atrophy or muscle weakness as support for his discounting of Dr. Akeson's opinions. Furthermore, Dr. Habecker's findings of a large defect medially in her right foot with limited range of motion, that she was unable to squat and rise or hop on one

leg, and that her chronic lumbar pain and pain in both feet and right ankle limited her walking and standing could be deemed to be somewhat consistent with a portion of Dr. Akeson's RFC and somewhat contradictory to the state agency reviewing physician's determination that Spain could stoop, kneel, and crawl frequently, as well as balance and crouch occasionally. The same could be said for the opinion of Dr. Stanley Rabinowitz, another consulting physician who examined Spain in December 2004. While Dr. Rabinowitz observed a normal gait and station, intact reflexes, full strength, and no atrophy, which could have supported the discounting of Dr. Akeson's opinions, he also concluded that she was unable to do heal and toe walking or hopping and had moderate difficulty squatting.

Finally, the Commissioner notes that following her ankle surgery, Spain was able to work for eight months as a cashier/stocker. This position reportedly required her to be on her feet for up to six hours a day for up to six days a week.

That being said, reliance on such observations or evidence is simply not reflected in the opinion of the ALJ, and it is not the province of the Court or the Commissioner to supply a rationale for his decision. Rather, from a plain reading of the ALJ's decision, it would appear that the ALJ based his findings of residual functional capacity on his own lay interpretation of the medical data reflected in a select assortment of medical records.

The Seventh Circuit has held that regardless of whether there may be adequate evidence in the record to support an ALJ's decision, "the ALJ must rationally articulate the grounds for her decision, building an accurate and logical bridge between the evidence and her conclusion because we confine our review to the reasons supplied by the ALJ." Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003), citing Steele v. Barnhart, 290 F.3d 936, 941

(7th Cir. 2002). The Court must agree with Spain that the ALJ in this case failed to sufficiently build an accurate and logical bridge, appearing to largely rely on his own assessment of the medical evidence and failing to discuss the import of a large portion of the evidence, as well as the basis for the majority of his assignment of weight or discounting of the various physicians' opinions.

The Commissioner may very well be correct in asserting that there is substantial evidence in the record upon which the ALJ could base his opinion that Spain is not disabled within the meaning of the Act. However, as the extent to which the ALJ in this case properly interpreted the evidence from Spain's treating physicians and/or relied on other medical evidence in the record in discounting their opinions is not adequately reflected in his opinion, this matter must be remanded to the Commissioner for further explanation and clarification of the ALJ's weight attributed to and discounting of the treating physicians' opinions and corresponding residual functional capacity determination. The Court therefore concludes that the Agency's decision must be reversed pursuant to sentence four of 42 U.S.C. § 405(g), which authorizes the Court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This matter will be remanded to the Commissioner for rehearing to correct the above identified deficiencies.

**CONCLUSION**

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [#13] is GRANTED, and the Commissioner's Motion to Affirm [#15] is DENIED. The Commissioner's decision in this matter is REVERSED, and the case is REMANDED to the

Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration. The Clerk's Office is hereby directed to enter Judgment in favor of Plaintiff and against Defendant.

    ENTERED this 12th day of July, 2010.

                                          s/ Michael M. Mihm
                                          Michael M. Mihm
                                          United States District Judge